1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEVIN LEE MAYBERRY,

        Petitioner,

    v.

GARY SWARTHOUT, Warden,

        Respondent.

_____/

No. C 12-2609 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Kevin Lee Mayberry filed this *pro se* action for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his 2008 state convictions for second degree murder, gross vehicular manslaughter by an intoxicated person with prior convictions for driving under the influence, and related offenses. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Petitioner was charged in Contra Costa County and tried by a jury. The California Court of Appeal described the evidence that led to the convictions:

> The charges in this case relate to a freeway accident that killed Mark Gelardi and injured his sister, Nancy Hill. Defendant was driving the car that hit Hill and Gelardi. At the time of the accident he had three prior DUI convictions, had enrolled in at least three programs for drunk drivers, and was in an 18-month program. His license had been revoked.
>
> Earlier on the evening of the accident defendant drove from his home in Suisun City to Oakland with his friend, Lynn Radney. He had already had a few drinks, and Radney thought he was tipsy. In Oakland they met up with a friend, drank some rum, and went to a sports bar. Later that night defendant and Radney left Oakland to return to Suisun City. Leah Dineen and Eric Ortiz were driving behind defendant on Interstate 80 and noticed his car weaving across all three lanes as it alternately sped up and slowed down.

Dineen called 911 to report defendant as a dangerously drunk driver. While she was on the phone, defendant took a curve too sharply, crashed into a sign on the right shoulder and traversed the freeway into the far left lane, where it struck Hill's Toyota 4Runner. The 4Runner rolled at least twice and Gelardi was ejected through the sunroof. There was no evidence that defendant ever applied his brakes before or during the collision.

A Richmond police officer arrived at the scene of the crash within minutes. Ortiz, who had pulled over, could see Gelardi's body on the shoulder of the highway. Defendant was revving his engine as if he were trying to back up and leave the scene. When Ortiz yelled at him to stop, defendant "just casually sat back in his seat" and lit a cigarette.

Defendant refused to blow into a preliminary alcohol screening device at the scene. Once he was at the county hospital, he refused to allow his blood to be drawn and struggled until police restrained him in order to take a blood sample. His blood alcohol level was 0.31 percent – almost four times the legal limit.

Cal. Ct. App. Opinion, ¶. 1-2.

Mayberry was convicted on all counts. The trial court found true the allegations that Mayberry had three prior driving under the influence ("DUI") convictions. Mayberry was sentenced to a term of 15 years to life. On appeal, Mayberry's conviction was affirmed by the California Court of Appeal. His petition for review in the California Supreme Court was denied. Mayberry also filed a state habeas petition in the California Supreme Court, which was also denied.

Mayberry then filed this action. The court issued an order to show cause why the petition should not be granted as to the following claims: (1) trial counsel provided ineffective assistance in a variety of ways;[1] (2) Mayberry's right to due process was violated because there was insufficient evidence to support the second degree murder conviction; (3) Mayberry's right to due process was violated because there was insufficient evidence to support the gross vehicular manslaughter conviction; (4) the trial court erred in denying Mayberry's *Batson* motion regarding the prosecutor's peremptory challenge to a prospective juror;[2] (5) the admission of photographs that were revealed late in the trial by the decedent's family deprived Mayberry of his right to due process; (6) cumulative error; and (7) appellate counsel provided ineffective assistance in failing

---

[1] Mayberry's ineffective assistance of counsel claims are covered under headings "I" and "II" in his petition.

[2] Mayberry's *Batson* claim is covered in the arguments under headings "V" and "VI" in his petition.

United States District Court
For the Northern District of California

1  to present claims 1-3 and 6, above, for state appellate review.  Respondent has filed an answer,

2  and Mayberry has filed a traverse.

3

4  **DISCUSSION**

5  This court may entertain a petition for writ of habeas corpus "in behalf of a person in

6  custody pursuant to the judgment of a State court only on the ground that he is in custody in

7  violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The

8  petition may not be granted with respect to any claim that was adjudicated on the merits in state

9  court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was

10  contrary to, or involved an unreasonable application of, clearly established Federal law, as

11  determined by the Supreme Court of the United States; or (2) resulted in a decision that was

12  based on an unreasonable determination of the facts in light of the evidence presented in the

13  State court proceeding." 28 U.S.C. § 2254(d); *Williams (Terry) v. Taylor*, 529 U.S. 362 (2000).

14

15  A.  <u>Ineffective Assistance of Counsel</u>

16  A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

17  Amendment right to counsel, which guarantees not only assistance, but effective assistance of

18  counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth

19  Amendment ineffectiveness of counsel claim, a petitioner must establish two things.  First, he

20  must establish that counsel's performance was deficient, i.e., that it fell below an "objective

21  standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88.  Second, he

22  must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a

23  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

24  would have been different." *Id.* at 694.  A reasonable probability is a probability sufficient to

25  undermine confidence in the outcome.  *Id.*

26  Mayberry argues that there were six instances wherein counsel provided ineffective

27  assistance: (1) counsel failed to move to have the charges dismissed on the ground that the

28  prosecutor failed to preserve Mayberry's entire car as evidence; (2) counsel failed to challenge

**United States District Court**
For the Northern District of California

the proximate cause of death; (3) counsel failed to object to the prosecutor's prejudicial remarks on cross-examination; (4) counsel failed to move to dismiss the charges on the ground that the jury observed Mayberry in handcuffs; (5) counsel failed to challenge the chain of custody of photographs; and (6) counsel failed to move for a mistrial on the ground of juror misconduct. The court will address each argument in turn.

I.    Failure to move to dismiss charges based on failure to preserve Mayberry's car

Prior to trial, defense counsel moved to dismiss the charges because the prosecution had failed to preserve the right rear tire of Mayberry's car despite its knowledge that the tire had some potentially exculpatory value.  Specifically, the defense wanted to explore the theory that Mayberry's rear right tire had blown out just prior to the accident, and that the blowout or some other mechanical failure contributed to the accident.  The trial court held a hearing in which the prosecution's expert concluded that the tire became flat after the accident had already occurred. The trial court heard testimony from Officer Grimes, who had investigated Mayberry's car after the accident.  Officer Grimes, formerly a member of a group called the Multidisciplinary Accident Investigation Team, was an expert in vehicle inspection, mechanics, and accident reconstruction.  Reporter's Transcript ("RT"), p. 88.  He testified that upon inspection of Mayberry's car, he did not believe that Mayberry's car had suffered from any mechanical failure, including a faulty rear tire.  *Id.*, p. 113.  The trial court found that Officer Grimes' testimony to be credible when he testified that Mayberry's right rear tire did not show damage consistent with a blowout.  Thus, concluded the trial court, the tire did not possess any apparent exculpatory value at the time it was destroyed.  Further, the trial court found that there was no evidence that the normal course of police procedures were not followed with respect to notifying the registered owner prior to signing over the car.  Ultimately, the trial court denied Mayberry's motion to dismiss based on a failure to preserve the right rear tire.

Mayberry urges that counsel was ineffective because he failed to move to preserve the entire car – not just the right tire – for its potential exculpatory value.  Namely, Mayberry states that the lack of opportunity to investigate his car post-crash prevented the defense expert from

United States District Court
For the Northern District of California

being able to determine whether the accident occurred as a result of Mayberry's drunk driving, or because of a mechanical failure.

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means. *See California v. Trombetta*, 467 U.S. 479, 489 (1984); *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997). Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only *potentially* useful: there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence. *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Here, the preservation of Mayberry's car would only have been potentially useful evidence because Mayberry does not know whether an examination would have produced any exculpatory evidence regarding whether the car suffered from mechanical failure prior to the crash. *See, e.g.*, *Youngblood*, 488 U.S. at 56 n.* ("[t]he possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality."). Thus, in order to demonstrate a constitutional violation, Mayberry must show bad faith on the part of the government. *Fisher*, 540 U.S. at 547-48.

In *United States v. Sivilla*, the Ninth Circuit recently held that there was not clear error when the district court found that the government did not act in bad faith in a case involving the destruction of a vehicle. 714 F.3d 1168, 1172 (9th Cir. 2013). In that case, the defendant was arrested when he was found driving a jeep that contained cocaine and heroin hidden inside of the engine manifold. The defense requested that the jeep be preserved, and the court signed an order granting the defense's motion on September 21, 2010. On September 22, 2010, the jeep was forfeited and transferred to an auction wholesaler. On September 25, 2010, the case agent received the prosecutor's fax with a copy of the preservation order, and sent an email to the Department of Homeland Security's Fines, Penalties, and Forfeitures Section requesting that no evidence in the case be destroyed until the case had concluded. Both the case agent and the

1 prosecutor assumed that the Department of Homeland Security's Fines, Penalties, and Forfeitures

2 Section would contact them prior to destroying any evidence.  Instead, the auction wholesaler

3 sold the jeep on November 23, 2010, and it was stripped for parts.  The Ninth Circuit concluded

4 that even though the government may have been negligent in failing to preserve the jeep, the

5 exculpatory value of the jeep was not obvious and thus the district court did not commit clear

6 error in finding that there was no bad faith.  *Id.*

7         Similarly here, Mayberry has not shown that there was any reason for the prosecution to

8 believe that the right rear tire – much less the entire car – had any apparent exculpatory value.

9 Thus, had counsel moved to dismiss the charges based on the failure to preserve Mayberry's

10 entire car, the motion would have been denied.  Mayberry is therefore unable to demonstrate that

11 counsel's failure to make this motion resulted in prejudice.  *See Strickland*, 466 U.S. at 694.

12         To the extent Mayberry alleges that counsel was ineffective for failing to notify the

13 prosecutor to preserve the car, or failing to make a motion to preserve the car prior to the car's

14 destruction, Mayberry cannot demonstrate deficient performance or prejudice.  There is no

15 evidence that Mayberry's car suffered from any mechanical failure other than Mayberry's self-

16 serving statement that he heard a "bang" just before his car began to slide prior to the crash.  On

17 these facts, Mayberry has not rebutted the strong presumption that counsel's decision was

18 reasonable. *See, e.g.*, *Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000) (affirming the district

19 court's conclusion that counsel's failure to interview an alleged alibi witness was not deficient

20 when there was no evidence that the witness actually existed).  Even if counsel had made the

21 motion, and even if the car had been preserved, there is no reasonable probability that the

22 outcome of trial would have been different.  *Strickland*, 466 U.S. at 694.

23         Thus, the state court's rejection of this claim was not contrary to or an unreasonable

24 application of clearly established federal law.

25

26       II.      <u>Failure to challenge the proximate cause of death</u>

27         Prior to trial, the prosecution moved to prohibit several items from being introduced into

28 the record.  One such item was that neither party be permitted to mention that the decedent was

United States District Court
For the Northern District of California

1    not wearing a seat belt at the time of the crash.  RT, p. 36.  Defense counsel submitted without

2    argument.  *Id.*  The trial court granted the motion, stating, "It's just not really relevant here as to

3    whether or not the victim was wearing a seat belt or not."  *Id.*  Mayberry argues that defense

4    counsel should have argued that he be allowed to introduce such evidence at trial and that the

5    failure to do so was ineffective.

6        In *People v. Wattier*, 51 Cal. App. 4th 948, 954-55 (1996), the California Court of Appeal

7    rejected a similar argument in affirming the trial court's grant of the prosecution motion in limine

8    to exclude evidence that the victim of a car crash was not wearing a seat belt.  "As the failure

9    to use a seat belt was merely an absence of an intervening force which, at best, might have

10   broken the chain of the natural and probable consequences of [defendant's] conduct, it was

11   irrelevant to the ultimate issue of his criminal responsibility."  *Id.*

12       Applying state law, it was reasonable for counsel not to make such an argument.

13   Moreover, in light of the case law, had counsel argued against the motion in limine, there was

14   not a reasonable probability that the outcome would have been different.  Accordingly, the state

15   court's rejection of this claim was not contrary to or an unreasonable application of clearly

16   established federal law.

17

18       III.    Failure to object to the prosecutor's prejudicial remarks

19       Mayberry claims that counsel failed to object to the prosecutor's cross-examination of him

20   at trial when the prosecutor made prejudicial statements.  Specifically, Mayberry states that the

21   prosecutor's questions regarding Mayberry's "culture" was in reference to Mayberry being

22   African-American.  And, although counsel objected to the statements on grounds of relevance,

23   Mayberry argues that counsel should have objected instead based on the "gravity of the racially

24   inflammatory remark."  Petition, p. 54.  The challenged colloquy was as follows:

25   THE WITNESS:      I started realizing I had a drinking problem, but to what degree, to
                       what severity, I didn't know.
26   PROSECUTOR:       Okay.  So when the police are repeatedly arresting you and placing
                       you in handcuffs and taking you to jail, you were still unaware of
27                     your severity?
     THE WITNESS:      Again, I thought it was a string of bad luck because I'm sure I'm not
28                     the only one that drinks and drives.  I thought it was a string of bad

7

|                   |                                                                                                                                                  |
|-------------------|--------------------------------------------------------------------------------------------------------------------------------------------------|
|                   | luck for me.                                                                                                                                      |
| PROSECUTOR:       | Because that's –                                                                                                                                  |
| THE WITNESS:      | Every day I didn't drink and drive, so there –                                                                                                    |
| DEFENSE COUNSEL:  | Go ahead.                                                                                                                                         |
| THE WITNESS:      | There are – there are numerous of times where I didn't where I was consciously say: Well, man, I don't think I should drive, and I didn't drive. |
| PROSECUTOR:       | Because that's your culture.  That's what you and your friends do, right?                                                                         |
| DEFENSE COUNSEL:  | Objection.  Relevance.                                                                                                                            |
| THE WITNESS:      | That's my culture?                                                                                                                                |
| PROSECUTOR:       | Yeah.  It's okay in your group of friends to drink and drive.                                                                                     |
| THE WITNESS:      | No, it's not okay.  That's not what we do.  That's not my culture.                                                                                |
| PROSECUTOR:       | Well, Mr. Placido's been convicted of drinking and driving.                                                                                       |
| DEFENSE COUNSEL:  | Objection.  Relevance.  That goes to bias, not somebody's culture.                                                                                |
| THE COURT:        | It does.                                                                                                                                          |
| THE WITNESS:      | Wow.                                                                                                                                              |

RT, p. 977.

Under clearly established federal law, appeals to racial or ethnic stereotypes as grounds to find a defendant guilty violate due process and equal protection. *See Bains v. Cambra*, 204 F.3d 964, 974 (9th Cir. 2000).  However, "[a] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation will draw that meaning from the plethora of less damaging interpretations." *Williams v. Borg*, 139 F.3d 737, 744 (9th Cir. 1998) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)).  In *Williams*, the prosecutor's comment that defendant "pay the price" could have referred to either the crimes defendant committed or could have referred to defendant insisting on going to trial.  The comment was found not to be prejudicial because in the context of the entire proceedings it was "fair to infer" that the comment referred to the crimes defendant had committed.  *Williams*, 139 F.3d at 744.  Prosecutorial comments must be examined in context.  *See id.* at 745 (citing *United States v. Robinson*, 485 U.S. 25, 33 (1988)).

Here, it is fair to infer that the prosecutor's statements about Mayberry's "culture" were in reference to Mayberry's social circle and group of friends, rather than a comment on Mayberry's race.  Counsel's decision not to object on that ground was reasonable.  Even assuming that counsel should have objected on the ground that the comment was racially inflammatory, there is no probability to suggest that, but for counsel's unprofessional errors, the

**United States District Court**
For the Northern District of California

result of the proceeding would have been different, especially considering that counsel already objected on the basis of relevance. *Strickland*, 466 U.S. at 694. The state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.

IV.   <u>Failure to move to dismiss the charges because the jury observed Mayberry in handcuffs</u>

Prior to trial, defense counsel objected to Mayberry being transported across the courthouse hall in handcuffs while in the presence of prospective jurors. RT, p. 140. Counsel suggested instead that prospective jurors be brought into the courtroom, Mayberry be brought in through the side entrance, and then prospective jurors be asked to leave because the court had other matters to attend to outside of their presence. *Id.* Defense counsel noted that when Mayberry was brought into the courtroom, his hands were cuffed in front of him, and there was clothing placed over his wrists to cover up the handcuffs. *Id.* Upon questioning by the court, the bailiff responded that it could be confusing to the jurors, but it would not be clear to them that Mayberry was in handcuffs because they would not be able to see the handcuffs. *Id.*, p. 141. The court noted counsel's objection, overruled it, and reminded the parties that although the sheriff's policy was to handcuff prisoners as they are brought from the jail, the jurors would be voir dired about whether they would be prejudiced knowing that Mayberry was in custody and was not able to make bail. *Id.*, ¶. 141-42.

Mayberry claims that counsel was ineffective for failing to move for a mistrial because Mayberry had suffered prejudice by being handcuffed in the presence of jurors. Petition, p. 60. As a practical matter, nothing in the record suggests that if counsel explicitly moved for a mistrial rather than raised an objection in the manner in which he did, the result would have been different. The trial court would have denied counsel's motion, just as the court overruled counsel's objection. There is no indication that counsel's decision to object rather than to move for a mistrial was deficient performance.

Moreover, the law is clear that the trial court's decision was not prejudicial. In deciding

whether the decision to permit shackling violated due process, a federal habeas court should "determine whether what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986). Where care is taken to ensure that a defendant's shackling is not visible to the jury in the courtroom, prejudice is not presumed. *See, e.g.*, *Walker v. Martel*, 709 F.3d 925, 942-43 (9th Cir. 2013) (evaluating restraint and finding molded-plastic brace placed on defendant's leg underneath clothing "relatively unobtrusive" and creating a less prejudicial appearance because it suggested his "custody status, not a proclivity for violence, as his hands were unencumbered"); *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004) (juror's viewing of defendant in handcuffs with a coat draped over his handcuffed hands as he went to or from the courtroom was not inherently or presumptively prejudicial). A jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom does not presumptively warrant habeas relief. *See id.*; *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) ("*Rhoden II*"). In such cases, the defendant must demonstrate actual prejudice to warrant habeas relief. *See id.* He must show that the shackling "'had substantial and injurious effect' on the jury's verdict." *Ghent v. Woodford*, 279 F.3d 1121, 1132 n.9 (9th Cir. 2002). When a defendant's shackling was not actually seen by the jury in the courtroom, no error results, *see Rich v. Calderon*, 170 F.3d 1236, 1240 (9th Cir. 1999), or, put differently, the error is deemed not prejudicial, *see Rhoden II*, 172 F.3d at 636; *see, e.g.*, *Williams*, 384 F.3d at 592.

Here, Mayberry does not suggest that any juror actually saw him in handcuffs. Thus, there is no showing of actual prejudice from either the handcuffing or from counsel's failure to move for a mistrial. The state court's decision to deny Mayberry's claim was not contrary to, or an unreasonable application of, clearly established federal law.

V. Failure to challenge chain-of-custody of photographs

At trial, evidence was introduced that the decedent's sister-in-law, Margaret Gelardi, went to the tow truck yard the day after the crash where Mayberry's and the decedent's cars were. Ms. Gelardi intended to take pictures of the decedent's car for insurance purposes. She also took

pictures of Mayberry's car. She provided these pictures to the prosecutor almost two years later, on August 11, 2008 – the day before she testified. The photographs showed that the right rear tire of Mayberry's car was not flat.

Mayberry claims that counsel should have objected that the admissibility of the photographs violated the chain of custody rule. Petition, p. 63.

In California, the rules for establishing chain of custody are as follows: "'The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight."' *People v. Lucas*, 12 Cal. 4th 415, 444 (1995).

Based on Ms Gelardi's testimony, there was no indication that the photographs were tampered with or altered. RT, ¶. 753-56. At most, it would have been speculation to suggest that the photographs were tampered with, and thus, counsel's decision not to object to such testimony was a reasonable one. Moreover, even assuming that counsel's failure to object was deficient, Mayberry has set forth no reasonable probability that the outcome would have been different had counsel objected. The state court's decision to deny Mayberry's claim was not contrary to, or an unreasonable application of, clearly established federal law.

VI.    Failure to move for a mistrial on the ground of juror misconduct

During jury deliberations, a court interpreter reported to the bailiff that she had overheard two jurors in the elevator discussing the case. RT, p. 1143. The interpreter recalled one of the jurors saying something like, "The defense attorney should have got that during discovery." *Id.* The parties and the court eventually discovered that the jurors in question were Juror No. 17 and

Juror No. 123.  *Id.*  The court called both jurors back to question them privately, and neither juror could recall specifically what was said. RT, ¶. 1149-54.  The court and the parties agreed that the statement(s) appeared innocuous.  Although defense counsel had initially agreed to the court's suggestion to give the jury an admonition not to discuss the case, RT, ¶. 1144-45, he then retracted his decision, and chose instead to let the jury continue to deliberate without any admonition, RT, p. 1155.

Mayberry argues that counsel should have moved for a mistrial.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted).  Premature deliberations are not as serious as private communication, contact or tampering. *Davis v. Woodford*, 384 F.3d 628, 653 (9th Cir. 2004).  "What is crucial is 'not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury.'" *Id.* at 653 (quoting *United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974)).

With respect to determining whether counsel was deficient, the relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.  There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011) (citations omitted).

When the court questioned both jurors, there was no indication that either juror remembered the conversation in any great detail.  Moreover, one of them remembered that the discussion was less about discovery or photographs and more to do with why "somebody would be upset." RT, p. 1151.  Rather than admonish the jury, or move to substitute the two jurors,

defense counsel made a strategic decision to continue to let the jurors deliberate, lest it cause the jurors to be curious and begin asking each other what the discussions were about.  RT, p. 1155.  Each juror appeared to discount whatever statement was made about discovery, and counsel's decision not to pursue the seemingly harmless statement did not fall below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 689.  The state court's decision to deny Mayberry's claim was not contrary to, or an unreasonable application of, clearly established federal law.

B.      Sufficiency of the evidence to prove second degree murder

Mayberry claims that there was insufficient evidence to convict him of second degree murder, and specifically, to find beyond a reasonable doubt the element of implied malice.  Mayberry suggests that there was no evidence that he was objectively aware that his conduct at that time posed a danger to life.

The California Court of Appeal concluded that there was sufficient evidence to support the finding of implied malice.  That court explained:

> In cases of vehicular homicide, "second degree murder based on implied malice has been committed when a person does ""an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."" (*People v. Watson* (1981) 30 Cal.3d 290, 300.)  The malice necessary to support a vehicular homicide charge may be implied "when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*Id.* at p. 296.)  A finding of implied malice requires the application of a subjective standard, i.e., whether the defendant actually appreciated the risk involved. (*Id.* at ¶. 296-297.)

> "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation] '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289-1290.)

> B. Application
> 1. Murder

> Defendant's argument that there is no evidence he was aware of the danger he posed to others due to his intoxication stretches credulity past the breaking point.  Defendant had attended multiple DUI education classes due to his prior convictions.  If he did not know

United States District Court
For the Northern District of California

1    it before, he was taught in those classes how alcohol impaired his ability to drive; that
2    there is no safe alcohol level at which he could drive; and that driving under the influence
     kills.  He had seen multiple videos about the dangers of drunk driving.  Less than a year
3    before he killed Gelardi, defendant signed a statement that he had been advised it is
     "extremely dangerous to human life to drive under the influence" and acknowledged that
4    he could be charged with murder if he continued to drive while intoxicated and someone
     were to be killed as a result.  As was recently said in *People v. Moore* (2010) 187 Cal.
5    App. 4th 937, 941, the question of whether defendant was subjectively aware of the risk
     posed by his drunk driving "is best answered by the question: how could he not be?"

6    Also as in *Moore*, defendant attempts to contrast his case with others involving fatal
     accidents in which the courts found sufficient evidence of implied malice. (*See, e.g.,*
7    *People v. Watson, supra*, 30 Cal.3d at ¶. 293-294; *People v. Autry* (1995) 37 Cal. App.
     4th 351; *People v. Talamantes* (1992) 11 Cal. App. 4th 968.) [FN1]  He contends that
8    each of these cases involved some evidence of an "objective indication" of malice that
     is not present here.  But the existence of implied malice is decided in light of all of the
9    circumstances (*People v. Moore, supra*, 187 Cal. App. 4th at p. 942; *People v. Thomas*
     (1992) 2 Cal. 4th 489, 516), and none of the cases defendant cites suggest that implied
10   malice could not be found in the circumstances of this case. Taken together, the evidence
     of defendant's actions the night of Gelardi's death and his prior history as a drunk driver
11   and its consequences constitute substantial evidence that he acted with implied malice.

12            [Footnote 1:] Defendant also cites unpublished cases, in contravention of rule
              8.1115(a) of the California Rules of Court.  His reliance on those cases is
13            improper and will not be considered.

14   Cal. Ct. App. Opinion, ¶. 9-11.

15        The Due Process Clause "protects the accused against conviction except upon proof

16   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

17   charged." *In re Winship,* 397 U.S. 358, 364 (1970).  A convicted individual who alleges that the

18   evidence in support of his conviction cannot be fairly characterized as sufficient to have led a

19   rational trier of fact to find guilt beyond a reasonable doubt therefore states a claim for a

20   violation of due process.  *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979).  A court reviewing

21   an insufficiency of the evidence claim does not determine whether it is satisfied that the evidence

22   established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993).

23   Instead, "the only question under *Jackson* is whether [the jury's finding of guilt] was so

24   insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct.

25   2060, 2065 (2012) (per curiam).  The reviewing court may not substitute its judgment for that

26   of the jury; "it is the responsibility of the jury – not the court – to decide what conclusions should

27   be drawn from evidence admitted at trial." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012)

28   (per curiam).

When a sufficiency of the evidence claim that was rejected in state court is reviewed on federal habeas corpus, it is subject to a "twice-deferential standard." *Id.* First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 319). Second, the court must apply 28 U.S.C. § 2254(d)(1) to the state court's decision and determine whether its application of *Jackson* was objectively unreasonable. *Id.*

Sufficiency claims are judged by the elements as defined by state law. *Jackson*, 443 U.S. at 324 n.16. Despite Mayberry's assertion that there was no evidence suggesting that he was objectively aware that his conduct was dangerous to others, the state court's conclusion to the contrary was reasonable. Prior to the night of the incident, Mayberry had incurred three prior DUI convictions; he had taken classes about the effects of drinking and driving as a result of those convictions; he had previously signed a form stating that he knew it was "extremely dangerous to human life to drive under the influence" and pledged not to drive, RT, ¶. 968-70; and his driving that night was so erratic that a passenger in another car called 911 to report Mayberry's dangerous behavior. There was sufficient evidence, based on Mayberry's history of driving under the influence, the multiple drinking and driving educational classes Mayberry had taken previously, and his obvious reckless driving just prior to the crash, for the jury to find implied malice. The state court's rejection of his claim was not an unreasonable application of clearly established federal law.

C.     Sufficiency of the evidence to prove gross vehicular manslaughter

Mayberry also claims that there was insufficient evidence to convict him of gross vehicular manslaughter, and specifically, to find beyond a reasonable doubt the element of gross negligence. Mayberry suggests that although he was intoxicated, the evidence showed that he was driving at normal speeds on an almost empty freeway with no complaints about the manner of his driving from his passenger.

The California Court of Appeal concluded that there was sufficient evidence to support

1    the finding of gross negligence. That court explained:

2        The same evidence undermines defendant's contention that the evidence was insufficient
         to prove gross vehicular manslaughter. "'[G]ross negligence is the exercise of so slight
3        a degree of care as to raise a presumption of conscious indifference to the consequences.
         [Citation.] "The state of mind of a person who acts with conscious indifference to the
4        consequences is simply, 'I don't care what happens.'" [Citation.] The test is objective:
         whether a reasonable person in the defendant's position would have been aware of the risk
5        involved.'" [FN2] (*People v. Ochoa*, *supra*, 6 Cal.4th at p. 1204.) It "may be shown from
         all the relevant circumstances, including the manner in which the defendant operated his
6        vehicle, the level of his intoxication, and any other relevant aspects of his conduct." (*Id.*
         at ¶. 1207-1208 [evidence was sufficient where the defendant had attended traffic school
7        and alcohol-awareness class as a result of a prior DUI, but nonetheless drove with a 0.15
         blood alcohol level at illegal speeds, wove in and out of adjoining lanes, made abrupt and
8        dangerous lane changes without signaling, and did not brake to avoid colliding with his
         victims' car].)
9
         [Footnote 2.] However, a jury may also consider the driver's subjective knowledge, for
10       if a "defendant actually appreciated the risks involved in a given enterprise, and
         nonetheless proceeded with it, a finding of gross negligence (as opposed to simple
11       negligence) would be appropriate." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1205.)

12       Here, defendant was driving with almost four times the legal blood alcohol content when
         he killed Gelardi. For at least six miles before the crash he was driving erratically enough
13       to prompt Dineen to call 911. We have no doubt the jury reasonably found that
         defendant, by virtue of his prior DUI's, was particularly well-versed in the dangers of
14       combining alcohol and driving. The evidence amply supports the conviction for gross
         vehicular manslaughter.
15
     Cal. Ct. App. Opinion, ¶. 11-12.
16
         As the California Court of Appeal reasonably concluded, a reasonable person in
17
     Mayberry's position, who had previously suffered three DUI convictions, and had taken
18
     mandatory classes to learn about the effects and risks of drinking while driving, would have been
19
     aware of the risk involved in his conduct. Indeed, Mayberry's blood alcohol level was four times
20
     the legal limit and the evidence showed that there was no indication that Mayberry had applied
21
     his brakes either before or after striking the sign on the side of the freeway. On these facts, the
22
     state court's rejection of Mayberry's claim was not an unreasonable application of clearly
23
     established federal law.
24

25
26   D.    *Batson / Wheeler* claim

27       During jury selection, Mayberry made a *Batson / Wheeler*[3] challenge when the prosecutor

28
     _____

         [3] *Batson v. Kentucky*, 476 U.S. 79 (1986) and *People v. Wheeler*, 22 Cal.3d 258 (1978).

1  used a peremptory challenge to excuse one of two prospective African-American jurors.  The

2  trial court found a prima facie showing of discrimination and invited the prosecutor to explain

3  her reasoning for excusing this juror.  Upon explanation, the trial court accepted the prosecutor's

4  answers as genuine and denied Mayberry's motion.

5      Mayberry claims that the prosecutor's explanations were not valid, and the trial court

6  failed to properly examine the prosecutor's reasons.

7      The California Court of Appeal rejected Mayberry's claim.  That court summarized the

8  proceedings and analyzed the claim as follows:

9                              B. Background

10  Each potential juror completed a questionnaire that sought information about his or her
   experiences with, and feelings about, drunk driving.  For example, the questionnaire

11  asked: "Is there anything about the nature of the charge of drunk driving that would make
   it difficult for you to be fair and impartial to a person accused of that crime?"; "If a person

12  were killed in an accident with a drunk driver, would you consider the drunk driver
   responsible for the death regardless of any other circumstances?"; "Do you believe that

13  every person who drives drunk is deliberately indifferent to the safety of others?"; and
   "Have you or any family members or close friends ever been the victim of an accident

14  involving a drunk driver?"  The questions were generally drafted so that "yes" answers
   indicated strong feelings against drunk driving, while "no" answers were more neutral.

15
   Potential juror B.D. gave "no" answers to all of the questions on the questionnaire,

16  described her occupation as child welfare program manager, and said she had an M.S.W.
   degree.  Questioning during voir dire elicited that her job with a social services agency

17  involves managing employees who supervise child abuse investigators.  The primary
   mission of her program is preventing child abuse.  B.D. does not work directly with

18  children, but focuses rather on finding social solutions for child abuse issues.  Her
   professional duties include handling high profile cases and staff issues, obtaining funding,

19  program development, education, and child abuse prevention. Most of her colleagues and
   supervisees are licensed social workers or therapists.  B.D. was not a licensed social

20  worker at the time of the trial, but was about to take her licensing exam.

21  Defendant moved to dismiss the venire under *Batson/Wheeler* immediately after the
   prosecutor excused B.D.  The trial court found a prima facie showing of *Wheeler* error

22  and invited the prosecutor to explain her peremptory challenge.   The prosecutor
   explained: "The composition of the [venire] doesn't have any bearing on whether or not

23  the People had a good faith reason for excusing Ms. [B.D.]  The reason that – the main
   reason is her job.  She is basically a social worker.  We've had two very polite

24  well-rounded female social workers but the People, as a rule of thumb, indefinitely [sic]
   in my strategy in this case and in any case is not to have jurors seated who do social work

25  in an occupation of forgiving and looking for social solutions to community issues.  By
   nature of their occupation, they work with psychologists and as a profession that the

26  People want to avoid altogether.  I did exclude another social worker, Ms. [G.].  And by
   the same strategy, the People also usually and in this case excused school teachers

27  because they work with children and they tend to be very forgiving and lenient if they're
   given any justification for behaviors.  They can be obviously – and that's a stereotype that

28  has to do with the job.  That's all we've got in jury selection.  I would have excused Ms.

17

J [.] if the defense didn't beat me to it.  He didn't seem very happy with her qualifications and it's how I predicted that he would excuse her.

"I also in chambers – and we just recently met for cause – I really liked juror no. 123, . . . who is next in order and I will be excusing Mr. [M.], the only juror before him as well to get [Juror No. 123] seated and seeing more promising prospective jurors is also an independent justifiable grounds for excusing less qualified jurors before him.  I want to make sure.  She said her questionnaire was all no's.  I know that for what defense counsel is seeking to do in this case.  He's used all 20 peremptory challenges to exclude any jurors who didn't answer the questionnaire all no.  And the People would prefer a juror who had a little bit of emotion to this questionnaire which was a bit inflammatory where a lot of the jurors couldn't resist running comments about how drunk driving is, it's unconscionable, it kills people, I don't want my children killed by a drunk driver.  And the People prefer given the opportunity – and I do have great opportunity here because I have so many peremptory challenges left – to have jurors who had some reaction to those informatory [ sic ] questions and he was an all no.  And [Juror No. 123] by contrast had some remarks about drunk driving as did – well [Juror No. 109] was before her but those are my reasons."

The court considered each of these reasons to be valid.  It noted the prosecutor had stated her intention to "get to [Juror No. 123] who is our last juror in our seat of nine pack of which Ms. [B.D.] would have been prior to that.  It doesn't necessarily mean that she would have been excused to get to [Juror No. 123] but certainly we were aware of the strategy to get to [Juror No. 123]."  The court found the prosecutor reasonably wanted to avoid having B.D. on the jury because of the nature of her work in "basically a social worker type of outfit."  The court observed that the prosecutor also excused another prospective juror who held a management position in a social work organization.  Lastly, the court accepted the prosecutor's explanations that she was trying to get jurors who had not given all "no" answers on the jury questionnaire.  "Therefore, the Court finds that the explanation given by [the prosecutor] with respect to [Juror B.D.] are factually based and legally appropriate.  The Court finds that the explanations given were the actual basis for the challenge and not for the purpose of racial discrimination and, therefore, the Court finds that [defendant] has not carried the burden of proof required to show that purposeful discrimination and the *Wheeler* Motion is denied."

## C. Analysis

Defendant maintains the prosecutor's stated reasons were pretext for a race-based juror challenge, but our substantial evidence review supports the trial court's contrary conclusion.  The prosecutor explained it was her practice to exclude potential jurors who worked in social work organizations because she believed they tend to be overly lenient and forgiving.  The explanation is plausible and confirmed by the fact that the prosecutor struck another potential juror for the same reason.  (*See People v. Wheeler*, *supra*, 22 Cal.3d at ¶. 280-282 [striking non-minority jurors on same grounds as minority group juror supports credibility of proffered reason].)  The fact that both prospective jurors were managers rather than social workers providing client services does not, in our view, undermine the validity of the prosecutor's preference to avoid jurors involved in the social work profession.

The prosecutor's additional explanation that she wished to avoid prospective jurors who, like B.D., answered "all no" on the jury questionnaire was also reasonable and credible.  The questionnaire elicited the prospective jurors' feelings on drunk driving, and the prosecutor could reasonably choose to dismiss potential jurors whose responses suggested indifference to the offense.  (*See People v. Reynoso* (2003) 31 Cal.4th 903, 925 [prosecutor may dismiss a prospective juror for almost any race-neutral reason, even

"based on a hunch or suspicion"].)  Moreover, the record confirms that the prosecutor repeatedly questioned "all no" jurors about their responses and referred to a number of them as "all no" persons when discussing their questionnaires with the court.

Although defendant says that, after she excused B.D., the prosecutor accepted some Caucasian jurors who had given all "no" answers, the trial court could reasonably conclude this did not evidence group bias.  "'Trial lawyers recognize that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge.  In addition, the particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. . . . [¶] It is also common knowledge among trial lawyers that the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge and the number of challenges remaining with the other side. . . .  Moreover, as the number of challenges decreases, a lawyer necessarily evaluates whether the prospective jurors remaining in the courtroom appear to be better or worse than those who are seated.  If they appear better, he may elect to excuse a previously passed juror hoping to draw an even better juror from the remaining panel. [¶] It should be apparent, therefore, that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar. . . .'"  (*People v. Reynoso*, *supra*, 31 Cal.4th at ¶. 918-919.)

We are also satisfied that the court made a sincere and rational assessment of the prosecutor's challenge to B.D.  In evaluating the prosecutor's explanation, "the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 919.)  Only when the prosecutor's stated reasons are unsupported by the record, inherently implausible, or both must the court do more than make a "global finding that the reasons appear sufficient."  (*People v. Silva* (2001) 25 Cal.4th 345, 386.)  Here, as we explained above, the prosecutor gave reasons for her decision that were supported by the record and were plausible.  Although not required, the court went beyond merely stating a "global" finding and explained why she credited the prosecutor's concern about B.D.'s involvement in social work.  The court confirmed that the challenged juror had indeed returned one of the "all no's" questionnaires, and stated that she believed the prosecutor's explanation that she was trying to get jurors whose responses to the questionnaire were less indifferent.  In short, the court independently assessed the prosecutor's professed rationales and supported its decision with reference to the record and its own observations and credibility assessments.  Defendant's claim that the court "abdicated" its responsibility to evaluate the prosecutor's stated reasons lacks merit.

Cal. Ct. App. Opinion, ¶. 4-9.

*Batson* held that the Equal Protection Clause forbids the challenging of potential jurors solely on the basis of race.  476 U.S. at 89.  *Batson* challenges involve a three-step inquiry. *Rice v. Collins*, 546 U.S. 333, 338 (2006).  First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge based on race.  *Id.*  If this showing is made, the burden the shifts to the prosecutor to offer a race-neutral explanation for the strike.  *Id.* Finally, the court evaluates "the persuasiveness of the justification proffered by the prosecutor"

1  to decide whether the defendant has shown purposeful discrimination.  *Id.* (internal quotation

2  marks omitted).  Ultimately, the defendant has the burden of persuading the court that the strike

3  was racially motivated.  *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

4       "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges

5  and the trial court has ruled on the ultimate question of intentional discrimination, the

6  preliminary issue of whether the defendant has made a prima facie showing becomes moot."

7  *Hernandez v. New York*, 500 U.S. 352, 359 (1991).  In deciding if the defendant has carried his

8  burden of persuasion at *Batson*'s third step, "a court must undertake a sensitive inquiry into such

9  circumstantial and direct evidence of intent as may be available."  *Batson*, 476 U.S. at 93

10 (internal quotation marks omitted).  The "totality of the relevant facts" includes the "prosecutor's

11 statements about his jury selection strategies and his explanations . . . for striking minority

12 jurors" as well as "the characteristics of people he did not challenge."  *Kesser v. Cambra*, 465

13 F.3d 351, 360 (9th Cir. 2006) (en banc).  As part of its evaluation of the prosecutor's reasoning,

14 the court must conduct a comparative juror analysis – that is, it must "compar[e] African

15 American panelists who were struck with those non-African American panelists who were

16 allowed to serve."  *Briggs v. Grounds*, 682 F.3d 1164, 1170 (9th Cir. 2012).  Where the

17 prosecutor's reasons for striking a black juror applies "just as well" to a non-black juror who is

18 selected for the panel, "that is evidence tending to prove purposeful discrimination" that should

19 be considered in assessing the genuineness of the prosecutor's proffered explanations.  *Miller-El*

20 *v. Dretke*, 545 U.S. 231, 241 (2005).

21       When evaluating the persuasiveness of the prosecutor's justifications at *Batson*'s third

22 step, the trial judge is making a credibility determination.  Because "it is widely acknowledged

23 that the trial judge is in the best position to evaluate the credibility of the prosecutor's proffered

24 justifications," due deference must be accorded to the trial judge's determination.  *Briggs*, 682

25 F.3d at 1171.  Indeed, even if "[r]easonable minds reviewing the record might disagree about the

26 prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's

27 credibility determination."  *Rice*, 546 U.S. at 341-42.

28       A state court's finding that the prosecutor did not engage in purposeful discrimination is

reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2).  *See Briggs*, 682 F.3d at 1170.  "Thus, a state court's decision will be upheld unless it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013) (quoting 28 U.S.C. § 2254(d)(2)).  Indeed, in evaluating habeas petitions premised on a *Batson* violation, "our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence, we must uphold it."  *Briggs*, 682 F.3d at 1170 (citing *Rice*, 546 U.S. at 338-42).  "This is because the question of discriminatory intent 'largely will turn on evaluation of credibility' and 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.'"  *Jamerson*, 713 F.3d at 1225 (quoting *Hernandez*, 500 U.S. at 365).

Here, the prosecutor listed three main reasons for challenging Juror B.D.  First, the prosecution explained that the main reason she challenged Juror B.D. was because of her profession as being "basically a social worker."  ART, ¶. 415-16.  As a matter of practice, the prosecutor avoids having social workers and teachers on the jury panel because, in general, they are very forgiving and look for "social solutions to community issues." *Id.*  The prosecutor noted that she had also excused another social worker from the jury pool.  ART, p. 416.  Mayberry has not identified any other potential juror – black or otherwise – who was employed as a social worker, much less not challenged by the prosecutor.

Second, the prosecutor was trying to get Juror No. 123, who was two jurors after Juror B.D. in the line-up, onto the jury because Juror No. 123 appeared more promising as a juror. ART, p. 416.  Indeed, the prosecutor had planned to excuse the juror after Juror B.D. as well so she could get to Juror No. 123.  *Id.*

Finally, Juror B.D. had answered "no" to all questions on her jury questionnaire, and the prosecutor preferred to have jurors who were a more emotionally moved by the questionnaire which was "a bit inflammatory."  ART, ¶. 416-17.  Mayberry argues that there were Caucasian jurors who also gave all "no" responses to the jury questionnaire who were not challenged by

1    the prosecutor.  As the California Court of Appeal noted, the dynamics of jury selection depend

2    on a combination of factors, and the trial court could have reasonably determined that this was

3    not evidence of group bias.  *See Briggs*, 682 F.3d at 1170 ("[W]e must defer to the California

4    court's conclusion that there was no discrimination unless that conclusion 'was based on an

5    unreasonable determination of the facts.'").  Nonetheless, even assuming that this reason was

6    race-based, the first two reasons the prosecutor gave were race-neutral.  If both race-based and

7    race-neutral reasons have motivated a challenged decision, the court may not consider whether

8    the challenged decision would have been made even absent the impermissible motivation; rather,

9    the court's inquiry is limited "to whether the prosecutor was 'motivated in substantial part by

10   discriminatory intent.'"  *Cook v. Lamarque*, 593 F.3d 810, 814-15 (9th Cir. 2010) (quoting

11   *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008)); *see e.g.*, *Crittenden v. Ayers*, 620 F.3d 962, 976

12   (9th Cir. 2010) (rejecting "mixed motives analysis" and remanding to district court to determine

13   if the peremptory strike was "'motivated in substantial part' by race" under *Cook*, and if so, to

14   grant the petition regardless of whether the strike would have issued if race had played no role).

15   The evidence revealed that the prosecutor clearly stated that her main reason for excusing Juror

16   B.D. was based on her job.  Thus, it was reasonable for the state court to conclude that, absent

17   the prosecutor's third reason for excusing Juror B.D., she still would have excused Juror B.D.

18   *See Rice*, 546 U.S. at 341-42 (even if "[r]easonable minds reviewing the record might disagree

19   about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the

20   trial court's credibility determination").

21        After reviewing the voir dire transcripts and questionnaires, the court did not find – and

22   Mayberry does not point to – any other juror who was not black, who was similarly situated to

23   Juror B.D., and remained on the jury.  For these reasons, the state court was not unreasonable

24   in concluding that the prosecutor was not substantially motivated by discriminatory intent to

25   challenge Juror B.D.

26

27   E.   Admission of Photographs

28        Mayberry's defense at trial was that the accident was caused either by a tire blowout or

22

some other mechanical failure.  During the prosecution's case-in-chief, one of the victims, Ms. Hill, told the prosecutor that she possessed several photographs of Mayberry's car that were taken shortly after the accident, that showed that Mayberry's right rear tire was not flat. Mayberry moved to exclude the evidence based on its late discovery.  The prosecution explained that Ms. Hill realized the photographs might be important after she had been excused as a witness, permitted to listen to the proceedings, and presumably learned what Mayberry's theory of defense was.  The trial court denied the motion, overruled Mayberry's objection, and found no discovery violation.

Mayberry argues that fundamental fairness required that the defense not be ambushed by the introduction of the photographs in light of their theory of defense because counsel had been proceeding with their defense in good faith, in light of the information that they had.

The California Court of Appeal rejected the claim that the admission of the photographs violated the Due Process Clause:

> The record definitively establishes that the photographs were incriminating, not exculpatory (they were extremely damaging to defendant's story that the accident was caused by a blowout) and that the prosecutor provided them to defense counsel as soon as she learned of them.  Defendant nonetheless urges us to find his Fourteenth Amendment right to a fundamentally fair trial required exclusion of the photographs because, he maintains, their admission was "devastating" to a defense developed in good faith, and because the prosecution failed to "ma[k]e inquiry" by asking surviving family members whether they had any incriminating photographs (or, presumably, any incriminating evidence at all) in their possession. . . .

> Nor did the admission of the photographs render the trial fundamentally unfair within the meaning of Due Process Clause analysis.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.  [The United States Supreme Court], therefore, [has] defined the category of infractions that violate "fundamental fairness 'very narrowly' as encompassing only those which "violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions.""" (*Dowling v. United States* (1990) 493 U.S. 342, 352.)  Here, defendant knew before trial that the prosecutor intended to introduce evidence, including the testimony of four California Highway Patrol officers and a post-collision vehicle inspection report, to show that none of defendant's tires were flat immediately after the accident.  While the late-discovered photographs provided strong corroboration of that evidence, they did nothing more than bolster a strong case that defense counsel knew he would have to counter when he designed his trial strategy.  Defendant concedes the prosecution "had not been 'sandbagging,'" and his accusation that his victim's family "seemingly" had is unwarranted.  The introduction of the photographs did not deprive defendant of a fair trial.

Cal Ct. App. Opinion, pp.13-15.

United States District Court
For the Northern District of California

The Supreme Court has repeatedly held that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law. *See Swarthout v. Cooke*, 131 S. Ct. 859, 861-62 (2011).  Thus, to the extent Mayberry is raising a discovery violation, it is a state law violation, and not cognizable in this proceeding.

Indeed, a state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  But note that only if there are *no* permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

As respondent points out, the jury had already heard evidence from four California Highway Patrol officers and a post-collision vehicle inspection report that demonstrated that Mayberry's right rear tire was not flat immediately after the accident.  The photographs only corroborated that evidence.  Thus, admission of corroborative evidence that Mayberry's right rear tire was not flat immediately after the accident was not arbitrary of overtly prejudicial.  On these facts, it is clear that the state court's rejection of Mayberry's claim was reasonable.

F.    Cumulative Prejudice of Ineffective Assistance of Counsel

Mayberry claims that he suffered from cumulative prejudice as a result of the errors of counsel.  However, the court has found that each claim of ineffective assistance of counsel is

1   without merit.  Where there is no single constitutional error existing, nothing can accumulate to

2   the level of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

3   Mayberry has not shown that there were any constitutional violations regarding the

4   ineffectiveness of trial counsel.  Thus, the state court's rejection of this claim was not contrary

5   to, or an unreasonable application of, clearly established federal law.

6

7   G.   Ineffective Assistance of Appellate Counsel

8           Mayberry argues that counsel on appeal was ineffective for failing to raise claims of

9   ineffective assistance of trial counsel, and the cumulative prejudice Mayberry suffered as a result

10  of trial counsel's ineffective assistance.  Claims of ineffective assistance of appellate counsel are

11  reviewed according to the standard set out in *Strickland*.  It is important to note that appellate

12  counsel does not have a constitutional duty to raise every nonfrivolous issue requested by

13  defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues

14  is widely recognized as one of the hallmarks of effective appellate advocacy.  *Miller v. Keeney*,

15  882 F.2d 1428, 1434 (9th Cir. 1989).  A "doubly" deferential judicial review is appropriate in

16  analyzing ineffective assistance of counsel claims under § 2254.  *See Cullen v. Pinholster*, 131

17  S.Ct. 1388, 1410-11 (2011).  When § 2254(d) applies, "the question is not whether counsel's

18  actions were reasonable.  The question is whether there is any reasonable argument that counsel

19  satisfied *Strickland*'s deferential standard."  *Harrington*, 131 S. Ct. at 788.  Here, the answer yes.

20          Here, as to each of the claims Mayberry asserts appellate counsel should have raised, a

21  "reasonable argument" exists supporting the state court's determination that appellate counsel

22  likely made tactical decisions to forego those claims in the appellate process.  The objective

23  reasonableness of counsel's failure to pursue the claims on appeal depends upon the merits of the

24  claims.  The issues that Mayberry contends counsel should have included in his appellate brief

25  have been rejected by this court and by the state courts for various reasons.  Therefore, it was not

26  objectively unreasonable for appellate counsel to not pursue them.  *See Miller*, 882 F.2d at 1434.

27  For similar reasons, there was no prejudice.  There is not a reasonable probability that, but for

28  counsel's failure to raise the claims, Mayberry would have prevailed on appeal.  *See Miller*, 882

F.2d at 1434, n.9 (citing *Strickland*, 466 U.S. at 688, 694).  Reviewing Mayberry's petition, as well as the record and the California Court of Appeal's decision, this court cannot say that there is no "reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 131 S. Ct. at 788.

H.      No Certificate of Appealability

        A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**CONCLUSION**

        The petition for writ of habeas corpus is DENIED on the merits.  The clerk shall close the file.

        IT IS SO ORDERED.

Dated: September 9, 2013                        _____
                                                SUSAN ILLSTON
                                                United States District Judge